# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BERNARD MATTHEWS, et al.** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.  09-2206 (JDB)** |
| **DISTRICT OF COLUMBIA, et al.** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiffs Bernard Matthews, William Christopher Malloy, Kevin T. Anderson, and Derrick Craig brought this action against the District of Columbia and several individual police officers. Plaintiffs allege that officers of the Metropolitan Police Department subjected them to strip and body cavity searches in public areas in violation of their constitutional rights. The District of Columbia and two individual officers have filed motions for summary judgment. For the reasons set forth below, the Court will grant both motions.

## BACKGROUND

This case arises from disturbing allegations. Each plaintiff alleges that he was subjected to a strip and body cavity search by a Metropolitan Police Department Officer, conducted in a public location and in the presence of other individuals including those of the opposite sex, and—for all but one plaintiff—absent probable cause. The alleged searches occurred in 2006 and 2007.[1] Specifically, plaintiff Matthews alleges that an officer "pulled Matthews['] pants down, grabbed his testicles and lifted them," repeated the search "in plain view" of a female officer, "then went around Matthews and spread Matthews' buttocks and looked between Matthews'

---

[1] The parties have not attached plaintiffs' depositions describing the searches, but the District does not contest that the evidence taken in the light most favorable to plaintiffs supports these allegations. For purposes of this motion, then, the Court will continue to treat as true plaintiffs' allegations about the nature of the searches.

buttocks while still in the presence of Female Officer." Compl. ¶¶ 12-14 [Docket Entry 1] (Nov. 20, 2009). Plaintiff Malloy alleges that an officer cut the string of his sweatpants, "removed Malloy's underwear, spread his buttocks, and began to probe around between Malloy's buttocks near his anus," and "conducted a search around Malloy's testicles, penis and foreskin." Id. ¶¶ 21-24. Plaintiff Anderson alleges that three officers "lowered Anderson's pants and underclothes, and while two officers held his buttocks open, Officer Croson ran his hand between Anderson's buttocks where he alleges he found contraband." Id. ¶ 32. Plaintiff Craig alleges that "one of the officers grabbed Craig's pants from behind and ran his hand inside Craig's underclothes through his buttocks toward his anus," and "continued to search Craig grabbing him in his crotch area." Id. ¶¶ 49, 51. A fifth plaintiff has been dismissed from the case. See May 22, 2012, Order.

Based on these searches, plaintiffs sued the District of Columbia and individual officers, both named and unnamed. After dismissing a number of counts, the Court allowed claims under 42 U.S.C. § 1983 for a deprivation of plaintiffs' First and Fourth Amendment rights to proceed against the District of Columbia and against the individual officers. See Memorandum Opinion [Document 22] (Aug. 9, 2010). Discovery proceeded on these surviving claims. Now, after the close of discovery, the District of Columbia and two individual officers have filed the motions for summary judgment at issue here.[2]

Despite discovery having been completed, the evidence the parties have provided to the Court is scant. First, plaintiffs have produced nine affidavits (apparently developed for a prior civil suit), three by plaintiffs in this case and six by other individuals who attest to having

---

[2] Plaintiffs have not attached a statement of genuine issues of material fact to their opposition to the District of Columbia's motion, violating the Local Rules. See Local Rule 7(h)(1) ("An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."). The Court has parsed the available record and drawn all factual inferences in plaintiffs' favor at this stage, but plaintiffs are admonished that further failures to comply with the Local Rules may result in adverse factual inferences or other action by the Court.

witnessed or been the victim of strip and cavity searches between 1995 and 2008. Several affiants state that they witnessed or were subject to a number of searches. For instance, one affiant attests to seeing "at least forty (40) strip searches" between 1998 and 2005. Ex. 2 to Def. D.C.'s Mot. for Summ. J. [Docket Entry 42-3] at 8 (Apr. 24, 2012). Together, the affidavits indicate that approximately 107 such searches occurred over the thirteen years discussed. None of the affidavits indicate that the incidents were reported to anyone. Second, the record contains a log of complaints made to the Metropolitan Police Department and to the Office of Police Complaints. The log reflects that the Department received 46 strip and cavity search complaints between 1998 and 2010, and the Office of Police Complaints received 24 such complaints between 2001 and 2012. It is not clear to what extent these complaints are duplicates. Plaintiffs also cite a civil suit by an individual named Gary Lover that ended in settlement with no admission of fault by the District. Finally, the record contains a copy of the District's 2001 General Order 502.01 delineating the procedures for searching individuals in police custody. That Order provides:

> Under no circumstances shall members of this Department perform a "body cavity" search. When probable cause exists that a prisoner has weapons, contraband or evidence secreted in a body cavity, the Assistant District Commander can authorize this search. The search will be conducted at the D.C. General Hospital in a secure and private area, where only a physician can conduct the examination. A sworn member of the same sex as the [person in custody] shall be present to seize any evidence obtained.

Ex. 1 to Pls.' Opp. to Def. D.C.'s Mot. for Summ. J. [Docket Entry 46-2] at 4 (July 13, 2012) ("General Order 502.01").

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

### I.      Defendants Brown and Sowers' Motion for Summary Judgment

Officers David Brown and Harry Sowers are the only two individual officer defendants to have moved for summary judgment. In their opposition to defendants' motion to dismiss, plaintiffs had alleged that Officer Brown witnessed the search of plaintiff Malloy and that Officer Sowers witnessed the search of plaintiff Anderson. Because plaintiffs had stated that the challenged searches were conducted in these officers' presence, the Court had allowed claims

against both officers to proceed on a bystander liability theory, under which an officer is liable if he "(1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." See Fernandors v. District of Columbia, 382 F. Supp. 2d 63, 72 (D.D.C. 2005). The two officers now argue that discovery has revealed that neither one witnessed or otherwise participated in the alleged searches, and that they are hence not liable for constitutional tort claims pursuant to 42 U.S.C. § 1983 under either a direct or bystander theory.

Officer Brown cites the deposition of plaintiff Malloy, the sole plaintiff who accused him of participating in an unlawful search. Malloy's deposition establishes that Officer Brown did not conduct the search and that Malloy does not know whether Officer Brown witnessed the search. See Ex. A to Defs. Brown & Sowers' Mot. for Summ. J. [Docket Entry 43-1] at 20:8-:13 (Apr. 24, 2012) (stating that Malloy "didn't even see [Officer Brown] at the search time," but that Officer Brown "came walking from behind the truck" "when everything was over"); see also id. at 20:15 (Malloy "do[esn]'t know if [Officer Brown] saw [the search] or not"). Moreover, Officer Croson, who conducted the search in question, described the search in responding to plaintiffs' interrogatories and listed the three officers present. Officer Brown was not included on that list. See Ex. D to Defs. Brown & Sowers' Mot. for Summ. J. [Docket Entry 43-4] at 7-8 (Apr. 24, 2012).

Officer Sowers cites the deposition of the sole plaintiff who accused him, plaintiff Anderson, in which Anderson is unable to identify any of the officers involved in his search. See Ex. B to Defs. Brown & Sowers' Mot. for Summ. J. [Docket Entry 43-2] at 11:10-:21 (Apr. 24, 2012) ("I do not know none of their names, none of their nicknames . . . . Well, like I said, it was back in '07, roughly almost five years."). Officer Sowers also cites his interrogatory, in which he

states that he did not assist in, observe, or conduct a public strip or cavity search of Anderson. Ex. C to Defs. Brown & Sowers' Mot. for Summ. J. [Docket Entry 43-3] at 8 (Apr. 24, 2012).

Plaintiffs did not respond to the individual defendants' motion for summary judgment. The Court will therefore consider these facts undisputed for purposes of the motion. See Fed. R. Civ. P. 56(e)(2). The materials, including the facts considered undisputed, establish that neither Officer Brown nor Officer Sowers was present during the searches. And the record gives no basis for a reasonable jury to conclude that either officer knew that a fellow officer was violating plaintiffs' constitutional rights or had a reasonable opportunity to prevent the harm. Summary Judgment in favor of both Officer Brown and Officer Sowers is hence warranted. See Fed. R. Civ. P. 56(e)(3) (when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it").

## II.    Defendant District of Columbia's Motion for Summary Judgment

To prevail on a section 1983 claim against a municipality, a plaintiff must show both that he suffered a constitutional violation and that the city is responsible for that violation. See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). The Court can make short work of the first requirement. The District does not contest that the searches, if they occurred as alleged, violated plaintiffs' Fourth Amendment rights. On the basis of plaintiffs' allegations, then, the existence of a Fourth Amendment violation is conceded.[3] The absence of a First Amendment

---

[3] And with good reason. It is elementary that, in most circumstances, a search without probable cause violates an individual's Fourth Amendment rights. See, e.g., Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973). Additionally, aside from the allegation that probable cause was lacking for any search, a body cavity search conducted in a public area and in the intrusive fashion alleged is unreasonable under the Fourth Amendment. See Bell v. Wolfish, 441 U.S. 520, 559 (1979) ("[Determining reasonableness under the Fourth Amendment] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."); see also United States v. Murray, No. 92-3168, 1994 WL

violation is also conceded. In response to the District of Columbia's interrogatories, plaintiffs indicated that they no longer allege a violation of their First Amendment rights. The District hence argues that they abandoned this claim, plaintiffs do not dispute that characterization, and the Court agrees with it.[4]

The parties' dispute, then, revolves around the second question: whether the District is responsible for the alleged violations of plaintiffs' Fourth Amendment rights. A municipality, such as the District of Columbia, is liable under 42 U.S.C. § 1983 if "the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011). The municipality is responsible only for its "own illegal acts," and so is "not vicariously liable under § 1983 for [its] employees' actions." Id. (internal quotation marks omitted); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("a municipality cannot be held liable under § 1983 on a respondeat superior theory"). To prevail against a municipality, a plaintiff who established a violation of his federal rights must further show "that the municipality's custom or policy caused the violation." Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004).

A violation may stem from a municipality's custom or policy in a number of circumstances. First, a plaintiff can show that "the municipality or one of its policymakers explicitly adopted the policy that was the moving force of the constitutional violation." Id. at 39 (internal quotation marks omitted). Second, the plaintiff can point to "the action of a policy maker within the government." Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Third, a municipality might engage in "the adoption through a knowing failure to act by a

---

119009, at *1 (D.C. Cir. Apr. 1, 1994) (per curiam) (noting that even prospect of defendant pushing drugs into his rectum "would not justify a strip search on a public street").

[4] Dismissal of the First Amendment-based claim against the remaining individual defendants would also seem appropriate, but those defendants have yet to move for dismissal. The Court will thus take no action as to them at this time.

policy maker of actions by his subordinates that are so consistent that they have become 'custom.'" Id.; see also Thompson, 131 S. Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."). Finally, "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations" can amount to an unconstitutional policy. Baker, 326 F.3d at 1306.

Here, plaintiffs agree that no explicit policy permitted strip or cavity searches in public and that no policymaker sanctioned the searches in question. Indeed, the parties agree that the governing policy strictly limited such searches. Plaintiffs attach to their opposition a General Order issued by the Metropolitan Police Department. See General Order 502.01.[5] As an initial matter, the General Order makes clear that the alleged searches were body cavity searches, rather than simply strip searches. See id. at 2 (body cavity search involves "searching of a prisoner's genital and/or anal cavities" while a strip search involves "having a prisoner remove or arrange his/her clothing to allow a visual inspection of the genital, buttocks, anus, breasts and undergarments"). The General Order bars "members of this Department" from performing a body cavity search in any circumstances. Id. at 4. A body cavity search can be conducted "only" by a physician, "in a secure private area" of the D.C. General Hospital. Id. A member of the police department "of the same sex of the prisoner" must be present to seize evidence. Id. Moreover, the body cavity search can be performed in this manner only when authorized by the Assistant District Commander. The General Order also limits strip searches, allowing them to be

---

[5] Although the General Order is titled "Transportation of Prisoners," it defines prisoners as including all persons in the custody of the Metropolitan Police Department, see General Order 502.01, at 2, and the parties agree that the Order governs the searches here. See also id. at 4 (directing officers to conduct a field search whenever "tak[ing] control" of an individual and listing guidelines for strip and cavity searches).

conducted "in a private and secure area," by a "sworn member of the same sex" as the person being searched, and "only with the authorization of the Assistant District Commander." Id. Given this written policy, plaintiffs argue that the District adopted "a policy of inaction" in the face of widespread body cavity searches in violation of the General Order and that officers conducted these searches with enough regularity to constitute custom. See Pls.' Opp. to Def. D.C.'s Mot. for Summ. J. [Docket Entry 46] at 8, 10 (July 13, 2012) ("Pls.' Opp.").

### a. District's Liability under a Failure to Train Theory

"[I]f a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." City of Canton v. Harris, 489 U.S. 378, 387 (1989). A "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but only "[i]n limited circumstances." Thompson, 131 S. Ct. at 1359. The policy of not training is actionable only where the "degree of fault . . . evidenced by the municipality's inaction" rises to the level of "deliberate indifference." City of Canton, 489 U.S. at 388 (emphasis omitted). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Thompson, 131 S. Ct. at 1360. Finally, a plaintiff must demonstrate that "the lack of training actually caused the [constitutional] violation in this case." Id. at 1358.

In other words, a plaintiff must show that the municipality decided to not train officers or to train them inadequately, that this decision was made with deliberate indifference, and that the shortcoming in the training program caused plaintiffs' injury. "[P]roving that a municipality

itself actually caused a constitutional violation by failing to train the offending employee presents difficult problems of proof, and [a court] must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into respondeat superior." Id. at 1365 (internal quotation marks omitted).

### i. Evidence that the District Failed to Train Officers

The evidence the parties have pointed to, viewed in the light most favorable to plaintiffs, could not support a verdict in plaintiffs' favor at trial.[6]  Plaintiffs' argument that the District failed to act in the face of repeated constitutional violations by officers suffers from a fundamental flaw: plaintiffs offer no evidence about the District's actions. There is no question that a failure to train on the District's part must be established. See City of Canton, 489 U.S. at 390 ("The issue in a case like this one . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent city policy."); id. at 391 ("for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury"); Thompson, 131 S. Ct. at 1360 ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.") (all emphasis added).

Inexplicably, plaintiffs provide no information about the training the District offered. Nor does the record indicate whether the training changed over the years. The materials provided by

---

[6] Ultimately, although the District bears the burden of showing that there are no genuine disputes of material fact, the Court must determine whether a reasonable jury could, based on the evidence offered, find in plaintiffs' favor. See Anderson, 477 U.S. at 252 ("[In ruling on a motion for summary judgment,] the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."). In other words, if the record is silent as to an element plaintiffs would have to prove at trial, the District has met its burden of showing no genuine dispute of material fact as to that element, and summary judgment is appropriate. See id.

the parties simply contain no information about the training the District conducted at any point. The record, hence, is insufficient for a reasonable jury to find the District's "continued adherence to" a faulty training program, Thompson, 131 S. Ct. at 1360 (internal quotation marks omitted). Because the record lacks evidence that the District failed to train in the first place, plaintiffs' claim founders before reaching the question whether a failure to train, if established, was done with deliberate indifference to individuals' constitutional rights.

Nor can plaintiffs infer failure by the District to train simply from the fact that a number of unlawful body cavity searches occurred. That would improperly bootstrap both a failure to train and deliberate indifference from the existence of a pattern of unlawful conduct. While a "pattern of similar constitutional violations by untrained employees" combined with "continued adherence" to the flawed approach can establish deliberate indifference, id. (internal quotation marks omitted), no case has indicated that, in the absence of any information about what a municipality actually did, a pattern of violations can establish that employees were untrained, that the municipality continued to adhere to a course, and that this continuation was deliberately indifferent. Moreover, the occurrence of unlawful cavity searches can hardly demonstrate a particular deficiency in the District's course of training, which also precludes section 1983 liability. See id. ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." (emphasis added)).

### ii. Evidence that any Failure to Train was Done with Deliberate Indifference

Aside from its inability to support a finding that the District's training program was deficient in a specific respect, the evidence in the record is too thin to support a finding of deliberate indifference. First, the District did do something to prevent such searches—it

promulgated a General Order stating: "Under no circumstances shall members of this Department perform a 'body cavity' search." General Order 502.01, at 4. Given the District's clear and self-explanatory policy about cavity searches—that "[u]nder no circumstances" are officers to perform them—it is hard to see how additional training is required. This is not a case where an open-ended standard might, without adequate training, lead to constitutional violations. Compare City of Canton, 489 U.S. at 381-82 ("shift commanders were authorized to determine, in their sole discretion, whether a detainee required medical care" but "were not provided with any special training (beyond first-aid training) to make a determination"). Given the clarity and administrability of the District's cavity search policy, a failure to train officers further does not amount to deliberate indifference, for no training can be clearer than the General Order's command. Indeed, given this clear policy, with no room for discretion, the alleged occurrence of several body cavity searches each year is much more reasonably attributed to a program that "has occasionally been negligently administered," (e.g., by failing to provide some officers with a copy of the General Order), see id. at 391, or even more plausibly, to "factors peculiar to the officer involved in a particular incident," see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 408 (1997), such as an officer's negligence or even willingness to flout the rules in pursuit of evidence. Neither occasional negligent administration nor actions of individual officers, however, can be attributed to the District. See City of Canton, 489 U.S. at 391; see also Brown, 520 U.S. at 408.

Moreover, the evidence is insufficient to establish a pattern of unconstitutional conduct for deliberate indifference purposes. Taking the facts in the light most favorable to plaintiffs, the 107 strip or cavity searches described in the nine affidavits took place between 1995 and 2008. The affidavits assert the existence of, on average, eight unlawful body cavity searches a year. But

nothing indicates that the searches described in the affidavits were reported to the District (nor do plaintiffs allege that they reported their searches), so these searches are irrelevant for determining the district's degree of fault. See Thompson, 131 S. Ct. at 1360 (disregarding incidents that "could not have put [policymaker] on notice"). Next, plaintiffs point to a civil lawsuit by Gary Lover based on an unlawful body cavity search that was filed in November 2006 and ended in settlement with the District in 2009. See Lover v. District of Columbia, No. 06-1872 (Nov. 2, 2006). Finally, the complaint log establishes that 70 complaints were made to the Metropolitan Police Department and the Office of Police Complaints between 1998 and 2012. But because the District changed its approach to cavity searches by promulgating the general Order in 2001 and the searches at issue occurred between November 2006 and 2007, only the complaints made between 2001 and 2006 are relevant—as the Supreme Court explained, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." Id. at 1360 n.7 (alteration and internal quotation marks omitted). The record does not reflect which complaints fall into this category. More importantly, complaints of misconduct—unlike affidavits declaring a certain search occurred—fail to show that the reported search indeed took place as alleged by the unknown declarants. See Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("sheer hearsay . . . counts for nothing" on summary judgment). To be sure, the existence of the complaints, regardless of the truth of the allegations, shows notice to the District that unlawful searches might be occurring. But absent additional evidence that the District should have found the allegations credible, the complaints do not allow a jury to conclude that the District had notice of a significant number of actual violations.[7]

---

[7] Indeed, in Thompson, the Supreme Court implied that alleged violations put an entity on notice only when found by a court. See 131 S. Ct. at 1360 n.7 (rejecting evidence of other constitutional violations because, among other

So the evidence of deliberate indifference here is a number of uncorroborated complaints an unknown subset of which occurred during the relevant time period (and which average to only five complaints a year), and one civil case that had barely started by the time of plaintiffs' searches and that ultimately settled without an admission of fault. Based on this evidence, "recurring constitutional violations are not the 'obvious consequence,'" <u>Thompson</u>, 131 S. Ct. at 1363, of failing to provide further training. Setting aside all other problems, then, the evidence in the record is insufficient to allow a jury to find deliberate indifference by the District, especially given the significant proof required of a plaintiff seeking to establish section 1983 liability based on a failure to act. <u>See</u> <u>id.</u> at 1365.

### iii.   Evidence that any Failure to Train Caused Plaintiffs' Injuries

Finally, even if a jury could reasonably infer that the District failed to train officers and was deliberately indifferent in doing so, plaintiffs' failure to identify specifically the alleged shortcoming in the District's training program is problematic because to prevail on their ultimate claim plaintiffs must also show that the "identified deficiency" was "closely related to the ultimate injury," i.e., that it caused the officers to perform an unlawful search. <u>City of Canton</u>, 489 U.S. at 391. But without knowing specifically the shortcoming in the District's training, it is difficult to say that this shortcoming, had it been corrected, would have led the officers involved in the four searches at issue here to behave differently.

### b.   District's Liability Based on Other Failure to Act

In the D.C. Circuit, any "failure of the government to respond to a need"—beyond just a failure to train—can amount to an unconstitutional policy when it shows deliberate indifference. <u>Baker</u>, 326 F.3d at 1306. Plaintiffs argue generally that the District adopted "a policy of inaction" in the face of unlawful strip and cavity searches. <u>See</u> Pls.' Opp. at 10. But plaintiffs

reasons, "no court has ever found any of the other <u>Brady</u> violations that Thompson alleges occurred").

provide no more evidence of other failures to respond than they provide of the District's failure to train. For instance, a claim might be cognizable if the District had a policy of ignoring complaints of unlawful searches. But nothing in the record indicates that the District had such a policy. Compare Cox v. District of Columbia, 821 F. Supp. 1, 14 (D.D.C. 1993) (providing statistical evidence to show slow or nonexistent response to complaints in the Metropolitan Police Department prior to implementation of new system in 1991), aff'd, 40 F.3d 475 (D.C. Cir. 1994).[8] Similarly, the record offers no support—and plaintiffs offer no argument—as to any other specific policy of omission. Plaintiffs could have developed this evidence by asking the District in discovery about these and other policies, but they failed to do so (or at least to provide the Court the results of any such inquiry). From the silent record, a reasonable jury cannot infer that the District had a policy of ignoring complaints, or that it had any other policy of inaction— let alone a policy of inaction in the relevant time period that, had it been remedied, would have averted the searches at issue.

### c. District's Liability Based on Custom

Plaintiffs argue that the constitutional violations were "the result of 'custom' in the Monell sense," because the "widespread pattern" of unconstitutional searches "is analogous to an implicit policy." Pls.' Opp. at 8. That argument also fails. First the number of instances alleged— an average of eight searches a year—hardly indicates that such searches were "practices so persistent and widespread as to practically have the force of law." Thompson, 131 S. Ct. at 1359. Second, given the District's explicit policy barring body cavity searches by officers in the field, it is particularly unlikely that the District implicitly "adopt[ed]" the opposite policy, see Baker,

---

[8] Indeed, the District of Columbia has a Police Complaints Board responsible for investigating complaints and taking some action within seven days. See D.C. Code § 5-1107. Absent evidence to the contrary, the Court will assume these procedures were followed. See U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies . . . .").

326 F.3d at 1306. Plaintiffs offer no cases in which a municipality was held liable under a custom or practice theory of causation—rather than a failure to train or supervise theory—where unlawful acts by employees contradicted explicit policy.

Finally, plaintiffs misapprehend the scope of municipal liability based on custom. They argue that, "[w]ithout having been directly authorized, tacitly encouraged, or even inadequately trained, police officers may fall into patterns of unconstitutional conduct," and that, when sufficiently "widespread," the practices may become actionable. Pls.' Opp. at 8. Widespread practices, however, are not enough. Indeed, plaintiffs' theory amounts to allowing respondeat superior liability against a municipality when a large number of violations occur. Rather, to prevail on a custom theory, plaintiffs must still show wrongful conduct by the municipality itself—that the municipality engaged in "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" see Baker, 326 F.3d at 1306 (emphasis added). A custom-based theory therefore also falters for the reasons explained above—that plaintiffs, who have provided no evidence about what the District did or did not do, have failed to create a genuine dispute of fact as to the municipality's "failure to act," id., for instance by showing that the District inadequately responded to complaints of unlawful searches.[9]

## CONCLUSION

Plaintiffs allege serious violations of their constitutional rights. But the record provides no basis for an award against the District of Columbia. By providing no information as to the

---

[9] Nor have plaintiffs established that the District had sufficient knowledge that a large number of violations were occurring. Cases cited by plaintiffs themselves make clear that establishing liability through custom requires evidence of deliberate indifference. See Randall v. Prince George's Cnty., 302 F.3d 188, 210-11 (4th Cir. 2002) ("[A] widespread practice of a particular unconstitutional method" is only a basis for municipal liability where there is "a failure by [municipal] policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage" (internal quotation marks omitted)). Plaintiffs' inability to show deliberate indifference is, hence, also fatal to a custom theory of section 1983 liability.

District of Columbia's training programs and responses to complaints of strip or body cavity searches, plaintiffs have failed to offer "evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 252. The evidence on this record, were it introduced at trial, would not allow a reasonable jury to find that a custom of allowing strip or body cavity searches, a failure to train officers about these searches, or any other policy of inaction caused plaintiffs' injuries. The District of Columbia is thus entitled to summary judgment.

For the foregoing reasons, the District of Columbia's and defendants Brown and Sowers' motions for summary judgment will be granted. A separate order has been issued on this date.

        /s/

JOHN D. BATES
United States District Judge

Dated: <u>February 19, 2013</u>